Mornings case number 4-16-0677 People v. Brian Mays. Appearing for the defendant is attorney St. Germain and for the state is attorney McDale. Good morning gentlemen. Good morning. Mr. St. Germain, are you ready to proceed? Yes, your honor. Alright, good night. Good mornings your honors and may it please the court, counsel. My name is Santos St. Germain and I am here on behalf of Mr. Brian Mays. Mr. Mays was found guilty of three attempted offenses. The first offense was home invasion, armed robbery, and residential burglary. All three offenses were merged into the first one and judgment and conviction was entered on the home invasion alone. However, the evidence attaches to all of the attempted offenses so we'll be addressing all of the offenses as one. There are three issues that I would like to address here today. One is that the evidence was insufficient to establish that Mr. Mays ever came into close or dangerous proximity in achieving the criminal purposes of the attempted offenses. In the same vein with that, the evidence never came, it was not sufficient to establish that Mr. Mays had the specific intent for achieving the criminal purposes alleged in this case. And second, the trial court legal finding in denying Mr. Mays his request for continuance was an abuse of discretion. Finally, I would like to address the trial counsel's error of law in arguing the request for continuance. The evidence in this case was at best very minimal. What it relied on was entirely on the testimony of the alleged accomplice, Mr. Mark Doolin. And all that Mr. Doolin was able to provide is that Mr. Mays was present when they drove to the location of the alleged crime. He never testified that there was a criminal purpose discussed. He never testified that Mr. Mays was part of that criminal purpose. In fact, he provided no evidence establishing that Mr. Mays even knew that there was a criminal purpose in going to Sonny O'Loughlin's house. All that he testified to is that he believed that his cousin, Joseph Blyde, was attempting to rob Mr. Sonny O'Loughlin. However, that belief is only supported, he only had that belief based on what he knew of Mr. Blyde from prior dealings in Tennessee. Where did the police find him? The police find Mr. Mays walking with his nephew, Gordon Malaki, in the same neighborhood as the alleged target's house. But Mr. Mays was found a couple of houses down and on the street, crossing the street, walking towards the police officers. There's only one individual remaining in the vehicle, correct? Yes. There were other individuals that were in the vicinity of the home that was later learned was arguably being targeted for an armed robbery, is that right? Yes. What was found in the vicinity by the police that the state argued linked them to the attempt robbery? Well, the only thing that was found was three weapons. They found a weapon hidden in a brush line close to Joseph Blyde, and then they found two other weapons underneath a wooden panel, two houses down from Sonny O'Loughlin's house. Now, there's nothing criminally, inherently criminal in possessing weapons. However, they were also, furthermore, they were not able to tie any of these weapons directly to my client, Mr. Mays. These weapons were tied and matched to the DNA of Malachi Gordon, Mr. Mays' nephew, and Joseph Blyde, the cousin of the witness testifying against my client. There were three weapons found, right? Yes. And three individuals who were walking, found walking in the area of the home which was to be robbed. Yes. There were two individuals that traveled from out of state that communicated their intention to rob the residence of that home. No, Your Honor, that's incorrect. There was no communication of an intent to rob the home. What happened is there was a communication between two cousins that there were cash, a large amount of cash in that home. However, one cousin, Mr. Joseph Blyde, said to the state witness, Mr. Doohan, that he's on his way up. There was no testimony or no statement as to whether what his purpose was for coming up. Well, so they didn't say, we want to rob this individual. No. They, though, pressed for the location of this individual, the address of the home, and that's where they were at the time they were arrested, in the vicinity of that home? That is correct. They were arrested in the vicinity of the home. What the evidence shows, what the evidence, the uncontradicted evidence shows, is that Mr. Joseph Blyde, Blyde and Malaki Gordon, pressed Mark Doohan for the address. However, there was no, it's conflicting as to whether Mr. Mays was part of that pressing, or whether Mr. Mays even understood why they were pressing him to give them that address. Mr. Mays, as far as we know, he was there in the presence with his nephew, Mr. Malaki Gordon. Furthermore, Mr. Doohan even testified that that was the first time he ever met Mays. He did not know Mays. He knew Gordon, and Blyde obviously was his cousin, but when he stepped in the car, all he knew, that was the first time he was meeting Mr. Mays. And he even told the police officer at his first interview that Mr. Mays wasn't part of the pressing. What was the jury to infer from all of these facts that we've just discussed, which to this point hasn't included that there had been prior communication that this home apparently contained a safe that, according to the resident of the home, contained cash upwards of $30,000? Sure. The only reasonable inference that the jury can make from all that we have here is that Mr. Mays was present when there was a possible criminal mischief. And even if you could assume that there was, that he was part of that criminal mischief, we don't know what his specific intent is. And the key here is that this is an attempt offense. Specific intent is required in order to establish the mens rea for an attempt offense. However, if we're talking about reasonable inferences, Your Honor, the only reason we can make a reasonable inference is because the only testimony we have is Mark Doohan's testimony. And the only reason we have Mark Doohan's testimony is because the trial court precluded trial counsel from investigating what Malachi Gordon or Joseph Bly could have provided in Mays' defense. Is that sufficient? Just simply that they might have had other information or could have testified differently in order to sustain your burden in that regard? Or do you have to have more concrete evidence of what it is that they would have said? Concrete evidence is not required. What is required is the potential materiality of their testimony. But however, what we must look at is the abuse of discretion standard here. And what the abuse of discretion standard is, what the actual error is. The error here is an error of law. The trial court assumes, based on trial counsel's statement, that these two witnesses would assert their Fifth Amendment right against self-incrimination. They would assert the privilege against self-incrimination. However, the trial court never examined the nature of their testimony, never even tried to see what that testimony could have been and whether it would lead to further prosecution. What did they say in their statements? We don't know, Your Honor. We do not know. All that we know, and this is uncontradicted by the state at the trial court level, is that that statement, whatever statement they made, was neither hurtful nor helpful to my client. And it's possible, the fact that it was not hurtful to my client is key. But the fact that it was not helpful either shows that there was room from which to determine what that testimony could have been, Your Honor. I'm sorry. Are you suggesting there's a mechanism wherein the court could have inquired the defense counsel in the other two cases as to what the nature of the testimony of each prospective client might have been? Not from trial counsel in the two other cases, but from the witnesses. Had trial counsel in this case subpoenaed the two other witnesses, there could have been an offer of proof. And what that offer of proof would have been, Your Honor, is to have either Joseph Bly or Malaki Gordon understand outside of the presence of the jury and examine what their testimony would have been. That is the same standard that was used in Cooper, and it's also the same standard that was used in, I believe it's in Red, the Illinois Supreme Court. With some type of understanding that they'd be immune from any additional prosecution or immunity for the information provided? Well, Your Honor, during the offer of proof, there is no requirement for immunity because we have to take into account that these two individuals have already pled guilty. But you're advocating or envisioning that defense counsel for those two particular defendants wouldn't come forward and object. I mean, certainly, whether or not it's incriminating or not, if information is given by a criminal defendant in a prosecution, it could certainly affect plea negotiations, how the case is ultimately resolved. I just don't see a mechanism wherein defense counsel is going to allow his client or her client to testify in a case in which they're sitting at charge of. Yes, I understand the difficulty the court is grasping with here, Your Honor, but let's take one step back and look at the error. The error is a denial of a continuance, and the request for continuance is to investigate the potentiality of that statement. That continuance, that request was made after the defendants, the two other potential witnesses, have pled guilty, and the request was for past sentencing. At best, the request could have gone further for 30 days after sentencing only to determine whether there were still issues to be resolved or whether there was a motion following, post-sentencing motion, or whether there would have been an appeal. So, given the fact that they pled guilty, any statement that would have been given at the offer of proof would not have affected their guilty plea and it would not have affected their sentencing because the request was made for and after the sentence. So, I don't think the problem that you're alluding to or you're pointing at, Justice Kavanaugh, actually affects the outcome in this case. What matters is whether these two witnesses could have successfully availed themselves of the protection of the self-incrimination, the privilege against self-incrimination. If this Court has no further questions, I would ask that you vacate my client's conviction or refer us for a new trial. Thank you. Okay. Thank you. Mr. O'Neill? May it please the Court, counsel. Before I forget, the trial court did ask, specifically asked defense counsel, whether those two co-defendants' testimonies would be beneficial to defendant, and the defense counsel admitted she did not know. The only thing that the two co-defendants had stated at that point was a complete denial of involvement in this crime. Since then, they had pled guilty, but of course that means that they were at least cooperating with the State to some degree. There's no indication that that would somehow make their testimony more beneficial to defendant. If anything, it would make their testimony more likely to harm defendant, just as Doolin did. Doolin pled guilty and also testified truthfully to this matter in this case. And just, excuse me for interrupting, but didn't Foster testify that Doolin told him defendant possessed the revolver during this series of events? That's the other thing I wrote down, Justice Harris. There was testimony from Doolin, or at least from the officer, actually from Doolin, that he identified one of the exhibits as the gun that defendant possessed before leaving the car. And as the officer testified, that gun was found in the proximity of Doolin and, or defendant and Gordon in the backyard of a stranger's home in the middle of the night. There was no reasonable, obviously no reasonable explanation for those two to be observed in a stranger's backyard in the middle of the night near O'Loughlin's house. That goes to the sufficiency of the evidence argument. It's important to remember the high standard of review, that being that when looking at the evidence in the light most favorable of the prosecution, whether the evidence was sufficient to convict defendant beyond a reasonable doubt. And also that allowing all reasonable inferences in favor of the state. The only reasonable inference to make, based on the evidence presented in this case, the only logical inference is that these three went to O'Loughlin's neighborhood, based on Doolin's observation the weekend before, of a large amount of cash in his safe. And these three, armed with guns, also clear plastic gloves, were found on defendant's person. He was found in the proximity of O'Loughlin's house in someone's backyard. And all of this was corroborated, at least partially, by the police, not only Doolin's testimony. Police found the guns that Doolin said that these three possessed near the three co-defendants. Defendant was found with clear plastic gloves. O'Loughlin testified that yes, Doolin was there the weekend before. And he did observe me getting into the safe. And there was a large amount of money in there. The police testified yes, we searched O'Loughlin's house and there was $12,000 in cash, as well as a small amount of cannabis in his home. So clearly, allowing the only reasonable inference, I would say in this case, is that defendant took multiple substantial steps in committing these three offenses. Home invasion, armed robbery, and residential burglary. Especially when we look at that evidence in the light in which the state is required. As for the second argument, the trial court's motion continues denying that. The factors the trial court must look at include the likelihood of the witness's testimony in the near future, as well as the likelihood that the testimony would be beneficial to defendant. The exact opposite of both of those were found in this case. It was clearly not an abusive discretion for the trial court to grant this continuance. In fact, it would be improper for them to grant the continuance based on the fact that they knew, well, this was prior to trial, they knew that these two witnesses were going to invoke their Fifth Amendment privilege. More importantly, on counsel's own admission, their testimony was not beneficial to defendant in any way. As the trial court said, it was purely speculative that they would have anything beneficial to defendant to testify to. On the contrary, since their complete denial of any involvement in this case, they had pled guilty, showing at least an indication of cooperation with the state. So, two big factors that their likelihood of testifying in the near future was virtually nil, based on their guilty plea motion, any motion for reconsider, post-sentencing motion, and the fact that they could appeal after that. The fact that their counsel had told defense counsel in this case, on advice from their counsels, not to talk to defendant or defense counsel. And the fact that they were planning on invoking their Fifth Amendment privilege. Clearly, the trial court did not abuse its discretion. I would argue that they made the proper call in denying that continuance. For the same reason, defense counsel's failure to subpoena these two witnesses wasn't ineffective assistance. The easiest way to dispose of this argument is that there was no prejudice to defendant. The outcome of the proceedings would have been exactly the same, even if these two witnesses had testified. The burden on the ineffective assistance to show prejudice is on defendant here, and there's simply nothing in the record that indicates or suggests these two witnesses would testify to anything beneficial to defendant at all. So, to speculate, we can speculate on what any witness would say at any time. Defendant's mom might say that he was with her or whatever. There's simply the burdens on defendant. There's nothing in the record that suggests their testimony would be beneficial to defendant. And so the outcome of the proceedings, no prejudice, second prong is strict with fails. Also, as People v. Human, which I cited in my brief, states, it's improper if you know beforehand that someone's planning on invoking their Fifth Amendment privilege, which trial counsel admitted in this case, and that means the trial court was well aware of it too, it would be improper to call those witnesses, let alone if they had anything beneficial to say, which of course there's nothing in the record that suggests they did in this case. However, let's say that trial counsel did improperly subpoena these witnesses and move for them to testify. Presumably, the trial court would have done the right thing. The trial court was well aware. The record shows that these two were planning on invoking their Fifth Amendment privilege. Presumably, the trial court wouldn't let them testify anyway. Either way, the outcome of the proceedings is the same. Counsel's performance in this matter was proper. It would be improper for her to try to procure their testimony knowing full well they were planning on invoking their Fifth Amendment privilege. So her performance was not objectively unreasonable, so both prongs of strict with fail. And there was sufficient evidence to prove defendant guilty beyond a reasonable doubt, and the trial court did not abuse its discretion in denying the motion to continue. And if this court has no more questions, I thank the court. I have a question. Yes. Sorry. I'm going to switch gears on you. Yep. Did the court actually impose a fine? Because it appears from looking at the record the court did not. And yet it seems like the state tends to concede that the court did impose a fine over $1,000. So, defendant, did the minimus say that there was a $1,000? I can't remember what. Well, my question is, does the record reflect that the court actually imposed a fine, I think, in the amount of $1,095? I don't think the record does indicate that, but I'm asking you as the representative. That's why I think I said assuming eligible fines were imposed. I think I agreed that I couldn't find that in the record where the trial court imposed that. Okay. It was attached to defendant's brief, I think, as an appendix to defendant's brief. Okay. So when you say assuming, you don't necessarily mean that you found that in the record. It's just a forsaken argument? Correct. Okay. Yes. All right. That's the only question. And I don't think that the pre-sentence custody credit falls under the new BARA rules, which is why I didn't move to supplement in this case. Okay. Thank you, Mr. McNeil. Thank you. Mr. San Jermaine, rebuttal argument? Yes, Your Honor. All right. Quickly on the fines issue question from Justice Turner. The fines were not imposed by the trial court. They were imposed by the clerk. There are clerk-imposed fines, and under the BARA rule, that cannot be challenged because it's not part of the record. However, that does not preclude the fact that Mr. Mays is still entitled to his $5 a day credit because that entitlement is statutory and he can raise it at any time. It has nothing to do with whether it's in the record or not. It's whether he's subject to the fines themselves, which he is. Well, how does the statute read? The statute read that any person incarcerated on billable offense who does not supply bail and against whom a fine is levied on conviction of such offense shall be allowed a credit of $5 for each day. The key language here is against whom a fine is levied on conviction. There is no doubt that those fines were levied against him. Yes, Your Honor. I didn't say anything, but you read the look on my face. How is it that you can assume that an improperly levied fine could constitute a fine levied under the statute? Aren't we to necessarily assume that the legislature only contemplated that statutorily allowed fines, that authorized fines could be offset by this sentencing credit as opposed to some improperly levied assessment? Sir, if I understand your question, the fact that it wasn't levied by the trial court means that it was improperly levied and therefore it doesn't fall under the protection or the guarantee of the credit under statute. Your Honor, I believe that that is a problem that was created by the Supreme Court's decision in VARA. What the Supreme Court said in VARA is that there is no appellate jurisdiction for vacating the improperly imposed fines. Nonetheless, that doesn't mean that the client is not subject to those fines. He is still subject to them and they are levied against him. Now, they were improperly levied. Nonetheless, they were levied and he is entitled to his $5 a day credit. That's the best answer I can come up with because I think that is the correct answer, Your Honor. He is subject to those fines and there is no argument against that. And therefore, because he is subject to them, he can raise his $5 a day at any time. Going back to the merits or to the three other issues that were argued, I just have three points here. Human does not apply because in human, the attorney knew that they would be able to successfully invoke their Fifth Amendment right. And the attorney sought to put that into evidence to create some kind of doubt in the mind of the jury. That's not the question here. The attorney here doesn't know whether they will successfully protect themselves with the Fifth Amendment. The attorney assumes so. To determine whether they can successfully protect themselves with the Fifth Amendment, that is a determination that must be done by the trial court. And the trial court never made that determination. As to Foster's testimony, Foster clearly testified that Mr. Doolin was interviewed twice. At his first interview, Mr. Doolin implicated Joseph Brian Malarkey-Gordon and then said that my client was not involved in this. But then when he came back later, he was offered a plea deal and that is when he implicated my client. He changes his story as to my client's involvement. And the only reason we can't challenge that change of story is because there was never an offer of proof as to what Mr. Brian or Mr. Gordon would have said. And it doesn't matter, my third point and issue here, it doesn't matter whether Mr. Bly, whether their testimony or whether they pleaded guilty, we don't know if they were cooperating. In fact, the only reason there was a sentencing issue still on the table for them is because they were hoping for getting a boot camp from their conviction at sentencing. There was no offer or no statement made that they offered to testify against my client or that they would provide testimony against my client. What should have been done is an examination of the nature of their testimony. And whether the nature of that testimony, not whether it was helpful to my client, which is the hope we had here, but is whether the nature of that testimony was detrimental to them. And if it was not detrimental to them, then they could not have protected themselves of the Fifth Amendment privilege. I would ask this Court to reverse and remand. Counsel, may I ask a quick question? Yes, Your Honor. With regard to Doolin's two statements, can you point to something in the second part of the statement that was a change and not addition to? It's almost as if the way I read the statements, one is more developed, more information is given, not that there's any type of discrepancy between the two. Can you speak to that? Yes, there was a change. Because what Foster testified, Foster said that he said the old dude was sitting in the backseat with me and he was just silent the whole time. The two who was pressuring me was my cousin, Joseph Rye, and Milwaukee Gordon, which were the two people he knew. And he said, Mr. Mays was just sitting there, he was silent. And then when he came back after the plea deal was made, he said, oh, no, no, no, no. They were pressuring me. And then Mr. Mays jumped in and started pressuring me, which doesn't make sense because if you just met someone, I don't see how you would be able to pressure them. That's my answer to your question, Your Honor. Thank you. All right. Thank you. Thank you both. The case will be taken under advisement and a written decision shall issue.